FILED
United States Court of Appeals
Tenth Circuit

July 5, 2019

Elisabeth A. Shumaker
Clerk of Court

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JAVIER DOZAL,

    Defendant - Appellant.

No. 19-3041
(D.C. No. 2:09-CR-20005-KHV-8)
(D. Kan.)

_____

### ORDER AND JUDGMENT[*]
_____

Before **HOLMES**, **BACHARACH**, and **McHUGH**, Circuit Judges.
_____

Javier Dozal appeals the district court's dismissal of his 18 U.S.C.

§ 3582(c)(2) motion to modify his sentence.  In 2010 he pled guilty to conspiracy to

distribute and possess with intent to distribute more than 500 grams of a mixture or

substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1).  His

written plea agreement with the government, entered pursuant to Fed. R. Crim. P.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

11(c)(1)(C),[1] proposed a 151-month term of incarceration followed by five years of supervised release. The agreement specified "that the proposed sentence does not offend the now advisory sentencing guidelines" but indicated that the parties were "not requesting imposition of an advisory guideline sentence." R., Vol. 1 at 53.

The United States Probation Office prepared a Presentence Investigation Report (PSR). The PSR determined that a "quantity of methamphetamine attributed to this conspiracy and reasonably foreseeable to . . . Dozal exceeds 15 kilograms of methamphetamine (1.5 kilograms of Methamphetamine (actual)), resulting in a base offense level of 38," pursuant to U.S. Sentencing Guidelines Manual § 2D1.1(c)(1) (2009) (USSG). R., Vol. 3 (sealed) at 21. After further calculations, the PSR arrived at a total offense level of 35 and a Criminal History Category of I, resulting in an advisory Guideline sentencing range of 168 to 210 months' imprisonment.

The district court adopted the PSR without change, including its calculation of the Guideline sentencing range. It accepted the plea agreement and sentenced Dozal to the 151-month term of incarceration to which the parties had agreed.

Four years after Dozal's sentencing, the United States Sentencing Commission adopted Guideline Amendment 782. The Amendment, which applies retroactively, reduced the base offense levels assigned to certain drug offenses by two levels. *See United States v. Green*, 886 F.3d 1300, 1302 (10th Cir. 2018); USSG Supp. to

---

[1] Rule 11(c)(1)(C) provides that a plea agreement may "agree that a specific sentence or sentencing range is the appropriate disposition of the case . . . ."

App. C, Amendment 782. Relying on the Amendment, Dozal moved the court to modify his sentence pursuant to § 3582(c)(2), which permits a sentencing court to reduce a term of imprisonment if the defendant was "sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." *Id.*[2]

The district court initially denied the motion, reasoning that it lacked authority to modify Dozal's sentence because he had been sentenced pursuant to his Rule 11(c)(1)(C) plea agreement, not the Guidelines. We affirmed that denial. *United States v. Dozal*, 644 F. App'x 851, 853 (10th Cir. 2016). But subsequent to our decision the Supreme Court decided *Hughes v. United States*, 138 S. Ct. 1765 (2018), holding that a defendant who enters a Rule 11(c)(1)(C) plea may seek relief under § 3582(c)(2) "to the extent the prisoner's Guideline range was a relevant part of the framework the judge used to accept the plea agreement or determine the sentence," *id.* at 1778.

After *Hughes*, Dozal's counsel negotiated with the government to determine the appropriate relief under Amendment 782 and § 3582(c)(2). Their negotiations culminated in the parties' submission to the district court of an agreed order proposing a reduction of his term of imprisonment from 151 months to 135 months. But the district court concluded that the agreed order did not adequately address the

---

[2] In the plea agreement, Dozal waived his right to seek a modification of his sentence pursuant to § 3582(c)(2). *See* R., Vol. 1 at 55. But the government has not sought to enforce that waiver in these proceedings.

factors that must be satisfied for § 3582(c)(2) relief. *See United States v. C.D.*, 848 F.3d 1286, 1289-90 (10th Cir. 2017) (holding that to obtain relief under § 3582(c)(2), a defendant must show (1) "he was sentenced based on a guideline range the Sentencing Commission lowered subsequent to [his] sentencing"; (2) "his request for a sentence reduction is consistent with the Commission's policy statements related to § 3582(c)(2)"; and (3) "he is entitled to relief in light of the applicable sentencing factors found in 18 U.S.C. § 3553(a)."); *cf. also generally United States v. Aragon*, 922 F.3d 1102, 1115 (10th Cir. 2019) (Holmes, J., concurring) ("[I]t is the district court's job (in the first instance)—not the parties'—to determine the proper Guidelines range for a particular defendant . . . .").

The district court expressed concern that Dozal's "base offense level appears to remain at level 38 because the Court likely would attribute at least 8.15 kilograms of methamphetamine (actual) to him by using the conversion percentage set forth in the [PSR]." R., Vol. 1 at 67. It ordered Dozal to file a memorandum in support of his request for relief and ordered the government to file a response.

Dozal filed the required memorandum. The government did not respond. After reviewing Dozal's submission the district court concluded that it lacked jurisdiction to reduce his sentence under § 3582(c)(2).

The district court noted that under the Guidelines, the sentencing court generally calculates both the quantity of the methamphetamine mixture and the quantity of actual methamphetamine and uses whatever corresponding offense level is greater to calculate the defendant's base offense level. *See* USSG Drug Quantity

4

Table, n.B (2009). Under the 2009 Guidelines, a quantity of 15 KG or more of methamphetamine or 1.5 KG or more of methamphetamine (actual) triggered a base offense level of 38. *See* USSG § 2D1.1(c)(1). Under Amendment 782, however, the threshold quantity to trigger offense level 38 increased to 45 KG or more of methamphetamine or 4.5 KG or more of methamphetamine (actual). The question, then, was what specific quantity of methamphetamine should be attributed to Dozal.

To answer this question the district court examined its previous findings, including those portions of the PSR it had adopted at sentencing. The court focused on Paragraphs 64 through 70 of the PSR, which read as follows:

64. Various quantities of methamphetamine were seized throughout this investigation; some of the seizures were the result of traffic stops, and others were the result of consent searches and/or search warrants. At one residence, the methamphetamine exhibits seized were determined to be nearly 100% pure (Exhibit 17, 1,792 net grams at 98.3% purity; Exhibit 18.01, 214.9 net grams at 98.7% purity; and Exhibit 18.03, 6.1 net grams at 92.6% purity). Other seizures ranged in purity from 11.9% to 56.9%. The average purity of all the methamphetamine seized was 46.05%.

65. In paragraphs 43-44, Naranjo discusses the drug debt she owes to Javier Dozal for prior drugs which he supplied to her.

66. In paragraph 46, Javier Dozal tells Naranjo that he is sending his brother to her to provide her with "the set of sheets" (ounces of crystal methamphetamine).

67. In paragraph 57, Javier Dozal tells Nino he had "two exact little carpets" (two ounces of crystal methamphetamine).

68. In paragraph 58, Javier Dozal tells Nino he has the "seven dwarfs kind" (kilograms of cocaine) and the "kind that I work" (unknown ounces of crystal methamphetamine).

69. In paragraph 59, Javier Dozal tells Nino he needed to "get rid of two or 3" (2-3 ounces of crystal methamphetamine).

5

70. Additionally, numerous co-defendants in this case cooperated with the government and provided information relative to the conspiracy. Defendant Secundino Arias-Garcia (Nino) advised the case agent that he met Javier Dozal and his brother, Carlos Dozal-Alvarez, in 2003. Mr. Arias-Garcia reported that from that time until the time of his arrest in January of 2009, he bought multiple ounces of methamphetamine from both brothers. He reported on average purchasing two to three ounces a week from Guero and Charlie. Over a six year period, purchasing two ounces of methamphetamine [per] week, would result in 624 ounces of methamphetamine or 17.690 kilograms. Other defendants reported purchasing methamphetamine from Javier Dozal as well.

R., Vol. 1 at 88 (quoting PSR).

Adding together the drug quantities discussed in paragraphs 66 through 70 that could be attributed to Dozal, the district court derived a total methamphetamine mixture of 17.916 kilograms.[3] It then multiplied this figure by 46.05%, which according to paragraph 64 was the average purity of the methamphetamine seized during the investigation of the conspiracy. Applying this percentage, the court concluded the total amount of methamphetamine (actual) attributable to Dozal was 8.25 kilograms, which exceeded the threshold of 4.5 kilograms required for offense level 38 after Amendment 782. Because Dozal's base offense level remained 38, the district court determined he was not entitled to relief under Amendment 782. *See United States v. Gay*, 771 F.3d 681, 685 (10th Cir. 2014) ("Section 3582(c)(2) does not authorize a sentence reduction if a guideline amendment does not have the effect

---

[3] The district court found that paragraphs 66 through 69 each supported a finding of 56.7 grams of methamphetamine attributable to Dozal. *See* R., Vol. 1 at 89 n.1. Paragraph 70 attributed an additional 17.690 kilograms to Dozal. *See id.* at 88.

6

of lowering the defendant's applicable guideline range." (internal quotation marks omitted)).

We review the district court's decision to deny a sentence reduction under § 3582(c)(2) for an abuse of discretion. *United States v. Battle*, 706 F.3d 1313, 1317 (10th Cir. 2013). "A district court abuses its discretion when it relies on an incorrect conclusion of law or a clearly erroneous finding of fact." *Id.*

A district court may make a supplemental calculation of drug quantity for purposes of a § 3582(c)(2) motion, and "may look to its previous findings, including any portions of a PSR" it adopted to arrive at that calculation. *Id.* at 1319. "Although a district court may estimate the amount of drugs attributable to a defendant," it "must err on the side of caution" in doing so. *Id.* at 1320 (internal quotation marks omitted). The information relied on for the district court's calculation must have "some basis of support in the facts of the particular case and bear[] sufficient indicia of reliability." *United States v. Dalton*, 409 F.3d 1247, 1251 (10th Cir. 2005) (internal quotation marks omitted).

Dozal argues the district court clearly erred by attributing more than 4.5 kilograms of actual methamphetamine to him. He characterizes the district court's approach as "no better than guesswork." Aplt. Opening Br. at 18. He does not challenge the accuracy of the percentage figure contained in PSR paragraph 64 or the quantity of methamphetamine attributed to him under paragraph 70. But he contends the court should not have used the purity figure from paragraph 64 because it did not attribute the methamphetamine described in that paragraph to him. And without such

an attribution, he argues, there is no record evidence concerning the purity of the

methamphetamine attributable to him from which the district court could have

derived its supplemental drug quantity calculation.

We reject this argument, however, because the facts indicate the district

court's methodology was sufficiently reliable to support its conclusion. The seized

methamphetamine described in Paragraph 64 was distributed as part of the same

conspiracy as the methamphetamine attributed to Dozal in Paragraph 70.[4] Although

---

[4] Paragraph 70 attributes to Dozal methamphetamine distributed over a six-year period, beginning in 2003. The first five years of this period predated the charged conspiracy and the acts that formed the factual basis for Dozal's plea. *See* Plea Agreement, R., Vol. 1 at 48-52 (describing conspiracy and relevant conduct from March 2008 through January 2009). Dozal argues that the district court should not have "attribute[ed] Paragraph 64's purity percentages to the wholly unrelated methamphetamine" that was "supplied by Mr. Dozal to Arial-Garcia beginning in 2003, some five years prior to the charged conspiracy." *Id.* at 24 (emphasis added).

Dozal did not make this argument, or indeed any argument pertaining to the purity of the methamphetamine described in Paragraph 70, in his district court memorandum. While acknowledging that the district court had ordered him "to brief . . . whether Mr. Dozal's drug quantity precludes a sentencing reduction," R., Vol. 1 at 71, his argument centered on whether the methamphetamine described in Paragraph 70 could even properly be attributed to him under current Tenth Circuit law, *see id.* at 71-75. He has not renewed his argument concerning attribution on appeal. *See* Aplt. Opening Br. at 26 n.2.

Dozal argues that he was not required to lodge an exception to the district court's supplemental calculations to preserve his issues for appeal. *See* Aplt. Opening Br. at 14. But we conclude he should have raised his drug purity arguments in his sentencing reduction memorandum. In its order requiring him to file the memorandum, the district court directed him to "address the calculation of the base offense level under the amended guidelines." R., Vol. 1 at 67. It specifically warned Dozal that it contemplated applying the purity percentage in Paragraph 64 to the methamphetamine attributed to him in the PSR. It further advised him that if it did so, the amount of actual methamphetamine attributed to him would likely continue to dictate a base offense level of 38. *See* R., Vol. 1 at 67 & n.3. Notwithstanding this advisement, Dozal did not object to the district court's proposed methodology.

the drugs described in Paragraph 64 were not attributed to Dozal when determining

drug *quantity*, the district court did not clearly err in estimating that the *purity*

percentages between the methamphetamine described in paragraphs 64 and 70 were

likely to be similar.

---

Because Dozal did not challenge the district court's method for calculating purity, though provided an opportunity to do so, he has forfeited his argument concerning the district court's method of calculating drug purity. *See Havens v. Colo. Dep't of Corrs.*, 897 F.3d 1250, 1259 (10th Cir. 2018) ("We ordinarily deem arguments that litigants fail to present before the district court but then subsequently urge on appeal to be forfeited."). Nor has he asked us to review his unpreserved arguments under a plain-error standard. *See id.* at 1260 (discussing defendant's obligation to present plain-error argument to excuse forfeiture in district court). But the government has not objected on preservation grounds to his general drug purity argument, and we have chosen to resolve that issue on the merits. *See Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013) ("[T]he decision regarding what issues are appropriate to entertain on appeal in instances of lack of preservation is discretionary.").

That said, taking the further step to address Dozal's novel and unpreserved additional challenge to purity that draws a contrast between methamphetamine distributed by members of the conspiracy both preceding the conspiracy and during the conspiracy, would go too far. Dozal presents only limited briefing on this unique issue. He cites cases in which we found it erroneous for the district court to estimate quantities of drug shipments by extrapolating the varying size of shipments from one time period to another. Our discussion of the extrapolation method used in those cases shows how the calculation typically was performed in a manner that was insufficiently supported and unfair to the defendant. But Dozal cites no case extending this principle to calculating the purity of methamphetamine distributed prior to a charged conspiracy, where the quantities involved were distributed by the conspirators. Nor have we located such a case. And because he did not raise this issue in district court, we do not have the benefit of the district court's analysis. Under these circumstances, we decline to reach this additional issue.

9

We conclude that the district court's approach is particularly appropriate given that the average calculated in Paragraph 64 was based on numerous seizures of methamphetamine made over time and under varying circumstances (traffic stops, consent searches, and search warrants). It is logical to reason that the larger and more varied the sample used to calculate purity, the more likely it is that the average derived accurately reflects the overall percentage purity of the methamphetamine distributed as part of the scheme. *Cf. generally Mass. ex rel. Dep't of Pub. Welfare v. United States*, 737 F. Supp. 120, 127 n.9 (D. Mass. 1990) ("Basic statistical theory—which applies irrespective of the statistical model used—holds that the greater the subsample size, the smaller the variance, and the greater the precision of the statistical measurement."), *aff'd*, 984 F.2d 514 (1st Cir. 1993). In other words, there is little likelihood that the 46.05% figure represented an "outlier" percentage that unfairly or inaccurately reflected the purity of the methamphetamine attributed to Dozal.[5] We thus conclude that the district court's use of the purity figure in paragraph 64 was not clearly erroneous.[6]

---

[5] Dozal complains that on one occasion a buyer returned drugs to him because they were of poor quality, which "suggests that Mr. Dozal dealt in low-purity methamphetamine." *See* Aplt. Opening Br. at 20. But according to paragraph 64, the methamphetamine seized by law enforcement from the conspirators was as low as 11.9 percent pure. The incident Dozal describes is not inconsistent with the facts described in paragraph 64.

[6] In relying on this purity figure, the district court observed that "[t]he PSRs of several co-defendants included the same paragraph for the same purpose" of determining the average purity of the methamphetamine involved in the conspiracy.

10

We affirm the district court's order dismissing Dozal's motion for relief under

§ 3582(c)(2).[7] Dozal's motion to expedite this appeal is granted.


Entered for the Court


Jerome A. Holmes
Circuit Judge

---

R., Vol. 1 at 90.  In rounding out our analysis, we briefly note that Dozal cites this language in arguing that the district court relied on other defendants' PSRs without giving him notice and an opportunity to respond to the information within the PSRs. But there is no indication that the district court relied on anything unique about the codefendants' PSRs to justify the method it used in Dozal's case; rather, it simply noted that the PSRs took the same approach in both Dozal's and the codefendants' cases.

[7] Dismissal rather than denial is the appropriate disposition of an ineligible § 3582(c)(2) motion.  *See United States v. White*, 765 F.3d 1240, 1250 (10th Cir. 2014).  Although the district court's order did not specify whether it denied or dismissed the motion, the order concluded "the Court lacks jurisdiction to reduce defendant's sentence under Section 3582(c)(2)."  R., Vol. 1 at 84.  We elect to treat this disposition as a dismissal.